**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CE DESIGN LTD., | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 5838 |
| v. | ) | |
| | ) | The Honorable Rebecca L. Pallmeyer |
| PRISM BUSINESS MEDIA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSS, DIXON & BELL, LLP
55 West Monroe Street
Suite 3000
Chicago, IL 60603
(312) 759-5556

BRUNE & RICHARD LLP
80 Broad Street
New York, NY 10004
(212) 668-1900

September 8, 2008                    *Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ...............................................................................................2

ARGUMENT ..................................................................................................................10

I.      PENTON'S ESTABLISHED BUSINESS RELATIONSHIP WITH CE DESIGN
FORECLOSES CE DESIGN'S TCPA CLAIM .................................................11

II.     CE DESIGN CANNOT CHALLENGE THE PROPRIETY OF THE EBR
DEFENSE .........................................................................................................14

        A.     THE EBR EXEMPTION IS VALID .......................................................14

                1.      The Courts of Appeals have exclusive jurisdiction over
challenges to FCC rules ...........................................................14

                2.      Any challenge to the EBR exemption would be untimely .........16

                3.      The EBR exemption is valid .......................................................17

        B.     THE EBR EXEMPTION APPLIES TO CE DESIGN .........................19

CONCLUSION..............................................................................................................21

i

## TABLE OF AUTHORITIES

**Cases**

*Accounting Outsourcing, LLC* v. *Verizon Wireless Personal Commc'ns, L.P.*,
    329 F. Supp. 2d 789 (M.D. La. 2004) ........................................................................ 17

*Biggerstaff* v. *FCC*,
    511 F.3d 178 (D.C. Cir. 2007) ................................................................... 12, 14, 16

*Carnett's, Inc.* v. *Hammond*,
    610 S.E.2d 529 (Ga. 2005) ........................................................................................18

*City of Peoria* v. *Gen. Elec. Cablevision Corp. (GECCO)*,
    690 F.2d 116 (7th Cir. 1982) ................................................................... 15, 16

*Consol. Tel. Coop.* v. *W. Wireless Corp.*,
    637 N.W. 69 (N.D. 2001) ........................................................................................ 18

*Eclipse Mfg. Co.* v. *M & M Rental Ctr., Inc.*,
    No. 06 C 1156, 2006 WL 1547993 (N.D. Ill. May 26, 2006) ........................... 13, 17

*Food & Drug Admin.* v. *Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ................................................................................................. 19

*Heartwood, Inc.* v. *U.S. Forest Serv.*,
    230 F.3d 947 (7th Cir. 2000) .................................................................................... 20

*Leckler* v. *Cashcall, Inc.*,
    554 F. Supp. 2d 1025 (N.D. Cal. 2008) ................................................................... 16

*Qwest Corp.* v. *FCC*,
    482 F.3d 471 (D.C. Cir. 2007) .................................................................................. 15

*Rogers* v. *City of Chicago*,
    320 F.3d 748 (7th Cir. 2003) .................................................................................... 10

*Schism* v. *United States*,
    316 F.3d 1259 (Fed. Cir. 2002) ............................................................................... 19

*Texas* v. *Am. Blastfax, Inc.*,
    164 F. Supp. 2d 892 (W.D. Tex. 2001) ................................................................... 18

*United States* v. *Dunifer*,
    219 F.3d 1004 (9th Cir. 2000) .................................................................................. 15

*Weitzner* v. *Iridex Corp.*,
    No. 05 Civ. 1254, 2006 WL 1851441 (E.D.N.Y. June 29, 2006) ........................... 16

**Statutes, Rules and Regulations**

28 U.S.C. § 2342 ................................................................................................. 14, 18

28 U.S.C. § 2344 ................................................................................................. 16

47 U.S.C. § 402(a) .............................................................................................. 14, 15

47 U.S.C. § 405(a) .............................................................................................. 15

Fed. R. Civ. P. 56(c) ........................................................................................... 10

*In the Matter of Rules and Regulations Implementing the Telephone Consumer
    Protection Act of 1991*, 7 F.C.C.R. 8752 (1992) ........................................ 11, 12, 13, 15, 16, 18

*In the Matter of Rules and Regulations Implementing the Telephone Consumer
    Protections Act of 1991*, 10 F.C.C.R. 12,391 (1995)................................... 12, 20

*In the Matter of Rules and Regulations Implementing the Telephone Consumer
    Protections Act of 1991*, 18 F.C.C.R. 14,014 (2003)................................... 12, 19, 20

Junk Fax Prevention Act of 2005 ("JFPA"), Pub. L. No. 109-21, 119 Stat. 359 ........................ 12

Telephone Consumer Protection Act ("TCPA"),
    Pub. L. No. 102-243, 105 Stat. 2394 (1991)................................................. 11, 17

**Other Authorities**

Statement of Sen. Gordon Smith, Testimony before Sen. Com. on Commerce, Science,
    and Transportation, Subcom. on Consumer Affairs, Foreign Commerce and Tourism
    (Apr. 13, 2005), *available at* 2005 WL 853590 ....................................... 18

34516.DOC

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendant Penton Business Media, Inc. ("Penton")[1] respectfully submits this motion for an order granting summary judgment in its favor against Plaintiff CE Design Ltd. ("CE Design") on the grounds that there is no genuine issue as to any material fact and that Penton is entitled to judgment as a matter of law.

## PRELIMINARY STATEMENT

For nearly a decade, through its president and sole shareholder John Pezl, CE Design has subscribed to one or more Penton trade publications. Despite CE Design's long-standing business relationship with Penton – a fact CE Design denied for many months, before having to admit it in the face of confirming documents – CE Design asserted a claim against Penton under the Telephone Consumer Protection Act ("TCPA"),[2] alleging that on August 23, 2004, CE Design received an unsolicited facsimile advertisement from Penton, in purported violation of the TCPA.

CE Design's TCPA claim has no merit. Under the law in effect in 2004, including Federal Communications Commission ("FCC") rules governing the implementation of the TCPA, the existence of an established business relationship between Penton and CE Design establishes CE Design's consent to receive faxes from Penton and thereby constitutes a complete defense to CE Design's TCPA claim. Penton is therefore entitled to summary judgment on CE Design's individual claim.

---

[1] The Complaint names "Prism Business Media, Inc." as the defendant ("Prism"). Prism changed its name to Penton Business Media, Inc. on March 15, 2007.

[2] CE Design initially alleged causes of action under Illinois common law and the Illinois Consumer Fraud and Deceptive Business Practices Act. (*See* Compl. ¶¶ 28-39.) CE Design voluntarily dismissed those causes of action after Penton moved to dismiss them. (*See* Not. of Voluntary Dismissal, Oct. 23, 2007.)

## STATEMENT OF FACTS

***Penton Generates and Maintains Accurate and Current Subscriber Information***

Penton is a business-to-business company engaged in publishing various media and sponsoring national trade shows. Penton publishes more than 100 trade magazines and electronic newsletters and sponsors many industry-specific trade shows and conferences throughout the United States and abroad. (Def's Rule 56.1 Stmt. of Undisputed Facts ("SUF") ¶ 5.) Penton's publications have an aggregate circulation of more than 5 million readers, including both individual and business subscribers. (SUF ¶ 6.)

To solicit new subscribers, Penton uses various methods, including placing subscription cards in publications, contacting potential subscribers through telemarketing campaigns, generating interest at trade shows, sending direct mail offers, and soliciting potential subscribers by email or on the internet. (SUF ¶ 7.) Through these various methods, Penton obtains detailed demographic information concerning each subscriber, including information such as the subscriber's industry, title, company size, and purchasing authority. (SUF ¶ 8.) Once a subscriber responds favorably to a solicitation and is "qualified" – that is, meets the demographic profile required for a free subscription – a subscription record is created. (SUF ¶ 9.)

To satisfy Penton's advertisers that its circulation information – including the number of subscribers and the reader demographics – is accurate and current, Penton subjects its circulation records to annual audits by BPA WorldWide ("BPA"). (SUF ¶ 10.) BPA is an independent, not-for-profit, self-regulating organization that provides consumer and business media audits. (SUF ¶ 11.) It has the largest membership of any media-auditing organization in the world, serving more than 2,500 media properties including over 1,900 business-to-business publications. (SUF ¶ 12.)

34516.DOC

Since 2002, Penton has employed Hallmark Data Systems, Inc. ("Hallmark") as its circulation fulfillment vendor. (SUF ¶ 13.) Hallmark maintains and updates Penton's subscription lists by, among other things, storing subscription source documents in accordance with BPA's audit requirements, managing subscriber accounts, and updating subscriber databases with information obtained from Penton's telemarketing, direct mail and email vendors. (SUF ¶ 14.) Subscribers are requalified on an annual basis to confirm that basic subscriber data remains accurate and that they still wish to receive the publication, thus ensuring that Penton's circulation records are current and accurate in accordance with BPA requirements. (SUF ¶ 15.) As with initial subscriptions, requalifications[3] are done in various ways, including through telemarketing campaigns, subscription renewal cards and by email or over the internet. (SUF ¶ 16.)

For each method of subscription initiation or requalification, Penton takes steps to ensure the reliability of its subscriber records. Signed subscription or renewal cards, for example, are imaged and maintained at Hallmark. (SUF ¶ 17.) Similarly, with respect to telemarketing campaigns, Penton employs premier telemarketing firms, including American Pacesetters and others. (SUF ¶ 17.) For each telemarketing subscription initiation or renewal campaign, a telemarketer reads from a standard script, approved by BPA, to ensure that each subscriber's choices regarding subscription initiation or renewal are accurately obtained and that the subscriber is qualified. (SUF ¶ 18.) Each qualification or requalification script also includes a personal identification question – such as the color of the responder's eyes or the city of her birth – to allow for later confirmation of the responder's identity. (SUF ¶ 19.) For each call,

---

[3] In the business-to-business industry, the words "requalification," "renewal" and "reverification" are used interchangeably to denote the renewal of a free subscription.

34516.DOC

American Pacesetters maintains a record of who was called, the date of the call, and the time of the call, so that this information can later be verified by BPA if necessary. (SUF ¶ 20.)

Similarly, for web-based or email subscription or renewal campaigns, Penton's email vendor maintains careful records. (SUF ¶ 21.) As with telemarketing campaigns, each subscriber who responds to an email solicitation or subscribes on the web must provide an answer to a personal identification question. (SUF ¶ 21.)

In connection with a publication's annual audit, Penton's circulation fulfillment vendors, including Hallmark, send BPA a database of subscriber records for that publication. (SUF ¶ 22.) At the same time, Penton sends BPA additional information concerning the publication and its subscribers, including copies of publications, advertising rate cards, postal receipts, printing invoices, subscription qualification forms, and telemarketing scripts, all of which allow BPA to verify Penton's circulation information. (SUF ¶¶ 23, 24.) Once BPA has received this information, it selects a random but statistically meaningful sample of subscribers and carefully audits the records for each by contacting the subscriber and confirming the information. (SUF ¶ 25.) BPA also uses publications and postal receipts to confirm the accuracy of the total number of subscribers. (SUF ¶ 26.) Once the audit is complete, BPA saves the audited file in what is called a "validated galley," which contains verified subscription information. (SUF ¶ 27.) BPA posts the results of these audits on its website, for review by advertisers and others in the industry. (SUF ¶ 28.) BPA has never issued to Penton a correction for incorrect data or information in connection with its audits of the publications to which CE Design has subscribed. (SUF ¶ 29.)

Although BPA does not maintain readily available copies of validated galleys for Penton publications, it does maintain archives of Penton's validated galleys. (SUF ¶ 30.) In connection

34516.DOC

with this lawsuit, and at Penton's request, BPA restored the archived validated galleys for certain publications. (SUF ¶ 31.) These validated galleys – which reflect audited information that BPA had obtained independently from Penton, Hallmark, and American Pacesetters – provide conclusive evidence of an extensive and long-term business relationship between CE Design and Penton during the years and months leading up to August 2004.

***CE Design's Long Subscription History with Penton***

CE Design is a small civil engineering and design firm. Since 2004, CE Design has initiated more than 100 TCPA putative class action lawsuits against various defendants. (SUF ¶ 32.) John Pezl is CE Design's president and sole shareholder. (SUF ¶ 33.) CE Design commenced this putative class action lawsuit on August 7, 2007, alleging that Penton sent CE Design a fax without its consent, in violation of the TCPA. A lengthy class discovery period ensued, during which CE Design, in verified responses to Penton's interrogatories on April 2, 2008, denied that it or any of its employees had any communication or a business relationship with Penton, and specifically denied that it or any of its employees ever subscribed to any of Penton's publications. (SUF ¶ 34.)

Because CE Design initially misrepresented its business relationship with Penton, Penton and its third-party vendors, as well as BPA, spent significant time and expense locating and restoring historical subscription records to search for CE Design's name and fax number, as well as other records related to the subscriptions. (SUF ¶ 35.) As reflected in BPA's validated galleys and in other evidence – including subscription renewal cards signed by CE Design's president – beginning in at least 1999 and during the entire putative class period (roughly August 2003 to August 2007), CE Design subscribed to several Penton publications, including American City & County ("AC&C"), Electrical Construction & Maintenance ("EC&M"), and Retail Traffic.

*American City & County*

Beginning in 1999 and continuing to this day, CE Design has subscribed to AC&C, a Penton publication serving the field of municipal and county government, including mayors, city and county managers, and city and county engineers, and related companies such as consulting engineers and other independent contractors. (SUF ¶ 36.)

Although CE Design initially denied any connection to Penton in its verified interrogatory responses, it now admits (at the end of the class discovery period and faced with incontrovertible evidence such as subscription renewal cards signed by Pezl) that it subscribed to AC&C between at least August 16, 2003 and August 23, 2004 – the year leading up to CE Design's receipt of the purportedly violative fax. (SUF ¶ 37.)

AC&C's validated galleys establish that CE Design has been a subscriber for more than eight years. (SUF ¶¶ 38-39.) In December 1999, Pezl filled out a subscription card and sent it to Penton requesting a subscription to AC&C. (SUF ¶ 38.) The validated galley confirms that the subscription was in the name of "J Pezl," that Pezl was the president of CE Design, and that CE Design was located at 1875 Rohlwing Road, Rolling Meadows, Illinois, with a phone number of (847) 392-3570 and a fax number of (847) 392-8252. (SUF ¶ 38.) Pezl provided all of this information, including CE Design's fax number, to Penton in 1999 at the time he initially subscribed to AC&C. (SUF ¶ 38.)

In each of the following seven years – from 2000 to 2006 – and then again in 2008, CE Design requalified its AC&C subscription by sending a signed subscription renewal card, confirming the information it had already provided. (SUF ¶ 39.) The record contains CE Design's renewal cards from 2004, 2005, 2006, and 2008. (SUF ¶ 42.) Each card is signed by Pezl with an "X" in a box labeled "YES!" in response to the statement "I wish to

receive/continue to receive *American City & County* FREE." (SUF ¶ 43.) In 2007, CE Design requalified its subscription via the internet. (SUF ¶ 40.) This internet requalification required the responder to answer a personal identification question regarding the color of his eyes. Pezl responded that his eyes are blue.[4] (SUF ¶ 40.)

*Electrical Construction & Maintenance*

From 2002 to 2006, CE Design subscribed to EC&M, a Penton publication that provides technical information to various electrical professionals, including electrical contractors, industrial plants, and engineers. (SUF ¶ 44.)

The EC&M validated galley from 2002 establishes that CE Design was a subscriber during that year. (SUF ¶ 45.) Like AC&C, the galley establishes that the subscription was in the name of "J Pezl," that Pezl was the president of CE Design, and that CE Design was located at 1875 Rohlwing Road, Rolling Meadows, Illinois, with a phone number of (847) 392-3570 and a fax number of (847) 392-8252. (SUF ¶ 46.) The galley contains additional specifics regarding CE Design and its EC&M subscription: that the subscription was initiated by CE Design's direct request, that the subscription was provided free in connection with CE Design's membership in the National Society of Engineers, that CE Design described itself as an engineering consulting business, and that CE Design had between 10 and 19 employees. (SUF ¶ 47.) The galley also indicates that the responder who provided this information answered a personal identification question, responding "Chicago" to a question regarding place of birth.[5] (SUF ¶ 46.)

The 2003 and 2004 EC&M validated galleys establish that CE Design's subscription information was confirmed each of the following two years by telemarketers from American

---

[4] Although Penton did not have the internet requalification record at the time it deposed Pezl, counsel for Penton observed that Pezl's eyes are blue. (SUF ¶ 41.)

[5] Again, Penton did not have this galley when it deposed Pezl's assistant, Gayle Weiss. But Penton believes that Weiss was born in Chicago. (SUF ¶ 47.)

34516.DOC

Pacesetters.  (SUF ¶ 48.)  During each requalification, the responder, who each year identified herself as Pezl's assistant "Gail Weiss,"[6] was asked a personal identification question.  In 2003, she was asked the color of her eyes – she said they were brown.  (SUF ¶ 49.)  In 2004, she was asked the month of her birth – she responded August.  (SUF ¶ 49.)  During her deposition, Weiss confirmed that she has brown eyes and that she was born in August.  (SUF ¶ 50.)  In both 2003 and 2004, Weiss confirmed that she was authorized to renew the subscription on Pezl's behalf. (SUF ¶ 51.)

The EC&M validated galley from 2005 indicates that while CE Design was a subscriber during that year, its subscription was not requalified by American Pacesetters.  (SUF ¶ 53.)  Nor was CE Design's EC&M subscription requalified in 2006.  (SUF ¶ 53.)  Therefore, in accordance with Penton's policy of cancelling subscriptions that are not confirmed in two consecutive years, CE Design was removed from the EC&M subscription list in 2006.  (SUF ¶ 54.)

*Retail Traffic*

From 2003 to today, CE Design has subscribed to Retail Traffic, a Penton publication focusing on retail real estate whose subscribers include developers, owners, retailers, brokers, architects, lenders, and other real estate service providers.  (SUF ¶ 55.)

Despite its repeated denials, including in its verified interrogatory responses, CE Design now admits that it subscribed to Retail Traffic from at least August 16, 2003 to August 23, 2004. (SUF ¶ 56.)  The Retail Traffic validated galleys from 2003 to 2007 confirm CE Design's status as a subscriber to that publication during that entire five-year period.  (SUF ¶ 57.)

The 2003 validated galley confirms that CE Design began subscribing to Retail Traffic that year, in response to a telephone solicitation.  The galley establishes that the subscription was

---

[6] Weiss's first name is Gayle but is misspelled as "Gail" in Penton's records.  (*See* SUF ¶ 50.)

34516.DOC

in the name of "John Pezl," that Pezl was the president of CE Design, and that CE Design was located at 1875 Rohlwing Road, Rolling Meadows, Illinois, with a phone number of (847) 392-3570. (SUF ¶ 58.) This subscription was initiated in 2003, around the time CE Design began filing scores of TCPA lawsuits. (SUF ¶ 58.) The galley also indicates that the responder (presumably Weiss) who initiated this subscription answered a personal identification question – she answered "brown" in response to a question about the color of her eyes. As stated above, Pezl's assistant Weiss confirmed during her deposition that she has brown eyes. (SUF ¶ 50.)

Validated galleys for Retail Traffic from 2004 to 2007 establish that CE Design requalified its subscription in each of these years. (SUF ¶ 61.) In 2004, CE Design renewed its subscription by phone, in 2005 it renewed by mailing in a signed subscription card, and in 2006 and 2007 it renewed via the internet. (SUF ¶ 61.) In connection with several of these subscription requalifications the responder was required to answer a verification question: in 2004 the responder answered that she was born in August, in 2006 the responder stated that his place of birth was Marshfield, and again in 2007 he stated that his place of birth was Marshfield.[7] (SUF ¶ 62.)

In addition to the validated galleys, Pezl personally signed two subscription cards in 2005 requesting continued receipt of Retail Traffic. Both subscription cards are signed by Pezl with an "X" in a box labeled "YES" in response to the question "Do you wish to receive/continue to receive a FREE subscription to *Retail Traffic*?" (SUF ¶ 64.)

---

[7] As stated above, Weiss has acknowledged she was born in August. As for the "Marshfield" responses, Penton did not have these records at the time of Pezl's deposition. Public records reflect, however, that Pezl is from Marshfield, Wisconsin. In addition, validated galleys for another Penton publication, CEE News, confirm that Pezl's father, John Pezl, was the president of Pezl Engineering in Marshfield, Wisconsin. (SUF ¶ 63.)

34516.DOC

***Penton Sends the Electric West Fax to CE Design***

For the benefit of its subscribers and past trade show attendees, Penton advertises its upcoming trade shows and other relevant events that may be of interest.  (SUF ¶ 65.)  Penton advertises primarily through the use of electronic mail and direct mail, but also occasionally sends fax advertisements to its current subscribers and its past trade show attendees.  (SUF ¶ 66.)

On August 23, 2004, Penton sent a fax to CE Design and other customers concerning an upcoming electrical trade show "Electric West."  (SUF ¶ 67.)  The fax was directed to "J Pezl" at "CE DESIGN LTD" and delivered to (847) 392-8252 – the same fax number CE Design had provided in connection with its various Penton subscriptions.  (SUF ¶ 68.)  A prominent notice at the bottom of the fax invited CE Design to let Penton know if it wished to be excluded from future fax notifications.  (SUF ¶ 69.)  CE Design has never sought to unsubscribe from future Penton faxes, either before or after the August 2004 fax.  (SUF ¶ 70.)

## ARGUMENT

Penton is entitled to summary judgment because the record evidence "demonstrate[s] that there is no genuine issue as to any material fact," Fed. R. Civ. P. 56(c), and "a rational trier of fact could not find for [CE Design]," *Rogers* v. *City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003).  Specifically, the record establishes that in August 2004, when CE Design received the facsimile that forms the basis of its individual claim, an established business relationship ("EBR") existed between Penton and CE Design because CE Design was a subscriber to at least three Penton publications.

Under the law in effect in August 2004, the EBR between Penton and CE Design creates a complete defense to CE Design's claims.  Moreover, CE Design cannot challenge the validity or application of the FCC rule setting out the EBR defense because (a) this Court lacks jurisdiction to hear such a challenge, (b) any such challenge would be untimely, and (c) any

challenge would be without merit. In addition, any argument by CE Design that the EBR

defense applies only to residential fax recipients – an argument CE Design's counsel has made in

other cases – would fail. The EBR defense clearly applies to business recipients as well.

**I.      PENTON'S ESTABLISHED BUSINESS RELATIONSHIP WITH CE DESIGN FORECLOSES CE DESIGN'S TCPA CLAIM**

In August 2004, when CE Design received from Penton the fax that gives rise to this

action, an EBR existed between the parties. At that time, CE Design subscribed to at least three

Penton publications. The existence of this EBR provides an exception to liability under the

TCPA. CE Design's claim therefore fails as a matter of law.

When Congress passed the TCPA in 1991, the original version of the statute prohibited,

among other things, the "use [of] any telephone facsimile machine, computer, or other device to

send an unsolicited advertisement to a telephone facsimile machine." Pub. L. No. 102-243 §

3(a), 105 Stat. 2394, 2396 (1991) (codified at 47 U.S.C. § 227(b)(1)(C) (1991)). The statute

defined "unsolicited advertisement" as "any material advertising the commercial availability or

quality of any property, goods, or services which is transmitted to any person without that

person's prior express invitation or permission." *Id*. § 3(a), 105 Stat. at 2395 (codified at 47

U.S.C. § 227(a)(4) (1991)). Congress empowered the FCC to promulgate rules and regulations

to implement the TCPA. *Id*. § 3(c), 105 Stat. at 2402.

The FCC acted quickly. In 1992, it promulgated a host of rules and regulations,

including an exemption from TCPA liability for faxes sent pursuant to an EBR. In a 1992

Report and Order, the FCC recognized the TCPA's ban on unsolicited fax advertisements, but

"note[d] . . . that facsimile transmission from persons or entities who have an [EBR] with the

recipient can be deemed to be invited or permitted by the recipient." *In the Matter of Rules and*

*Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 F.C.C.R. 8752 ¶

34516.DOC

54, p.8779 n.87 (1992) (the "1992 Report and Order").  In recognizing the EBR exemption for fax communications, the FCC explained that "based upon the comments received and the legislative history, . . . a solicitation to someone with whom a prior business relationship exists does not adversely affect subscriber privacy interests," and furthermore, that "the legislative history indicates that the TCPA does not intend to unduly interfere with ongoing business relationships."  *Id*. ¶ 34 (referenced in *id*. at n.87).  The FCC also observed that "a consumer's established business relationship with one company may also extend to the company's affiliates and subsidiaries."  *Id*.

In 1995, the FCC reaffirmed the EBR exemption in the face of a challenge from entities claiming the exemption was insufficiently precise.  *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protections Act of 1991*, 10 F.C.C.R. 12,391 ¶¶ 36-37, p. 12,408 (1995) (the "1995 Report and Order").  In rejecting this challenge, the FCC concluded that "[the 1992 Report and Order] makes clear that the existence of an established business relationship establishes consent to receive telephone facsimile advertisement transmissions."  *Id*. ¶ 37.  Then, in 2003, the FCC changed course and was prepared to decide that an EBR should not establish consent to receive fax advertisements under the TCPA.  *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protections Act of 1991*, 18 F.C.C.R. 14,014 ¶ 189, p. 14,127 (2003) (the "2003 Report and Order").  But this rule change never went into effect.  Aware that Congress was interested in the EBR exemption, the FCC postponed the effective date of its rule change to await congressional guidance.  *See Biggerstaff* v. *FCC*, 511 F.3d 178, 182 (D.C. Cir. 2007) (describing the history of the EBR exemption).  That guidance came in 2005, when Congress amended the TCPA to codify the EBR exemption.  *See* Junk Fax Prevention Act of 2005 ("JFPA") § 2(a), Pub. L. No. 109-21, 119 Stat. 359 (codified at 47

34516.DOC

U.S.C. § 227(b)(1)(C)(i)) (amending the TCPA to create an exception if "the unsolicited advertisement is from a sender with an established business relationship with the recipient"). Of course, because the proposed FCC rule change was never finalized, the EBR exemption remained "in force prior to the enactment of the JFPA." *Eclipse Mfg. Co.* v. *M & M Rental Ctr., Inc.*, No. 06 C 1156, 2006 WL 1547993, at *4 (N.D. Ill. May 26, 2006). Thus, under FCC rules until 2005, and under the JFPA since then, there has been an uninterrupted EBR exemption for fax solicitations since 1992.

This EBR exemption forecloses CE Design's claim against Penton. The undisputed facts set out above confirm that Penton and CE Design had an EBR when CE Design received the facsimile from Penton on August 23, 2004. At that time, CE Design subscribed to at least three Penton publications – EC&M, AC&C, and Retail Traffic.[8] During the years and months leading up to August 2004, CE Design (through Pezl or Weiss acting on his behalf) communicated with Penton on numerous occasions to request continued subscriptions to various Penton publications. CE Design's subscriptions to Penton publications establish an existing relationship between the two entities. Nor was this relationship foisted upon CE Design – Pezl himself continued to foster this relationship with Penton and signed renewal cards for at least two Penton publications (Retail Traffic and AC&C) after receiving the August 2004 facsimile.

Because a rational trier of fact would have to conclude that an EBR existed between CE Design and Penton in August 2004, Penton is entitled to summary judgment in its favor.

---

[8] During discovery, CE Design continued to deny its subscription to EC&M, notwithstanding the voluminous evidence establishing that it was a subscriber for many years, including during the time the Electric West fax was sent. Even if CE Design could put forward credible evidence disproving the subscription records – which it cannot – Penton would still be entitled to summary judgment under the EBR exemption based on CE Design's admission that it subscribed to AC&C and Retail Traffic during the relevant time period. *See* 1992 Report and Order ¶ 34 ("[A] consumer's established business relationship with one company may also extend to the company's affiliates and subsidiaries.").

34516.DOC

## II.   CE DESIGN CANNOT CHALLENGE THE PROPRIETY OF THE EBR DEFENSE

Because the EBR defense eviscerates CE Design's claim, it is likely that CE Design will attempt to challenge the validity and applicability of the EBR defense.  First, CE Design likely will attempt to argue that the FCC rule is invalid.  This argument would fail for at least three reasons:  (i) this Court lacks jurisdiction to hear such a challenge, (ii) the challenge would be untimely, and (iii) the challenge would be without merit.  Second, based on assertions CE Design's counsel has made in other TCPA lawsuits, CE Design may argue that the EBR exemption does not apply to businesses.  This contention also is also meritless.  We address these arguments in turn.

### A.   The EBR Exemption Is Valid

#### 1.   The Courts of Appeals have exclusive jurisdiction over challenges to FCC rules

CE Design cannot challenge the validity of the EBR defense in this proceeding because the Courts of Appeals have exclusive jurisdiction over challenges to FCC rules.  As recognized by the Seventh Circuit, Congress's grant of exclusive jurisdiction divests this Court of the power to determine the validity of the FCC's EBR exemption.

Specifically, Congress has legislated that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the [FCC] [with some exceptions not relevant here] shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28."  47 U.S.C. § 402(a).  Chapter 158 of Title 28 provides that the Courts of Appeals shall have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the [FCC] made reviewable by section 402(a)."  28 U.S.C. § 2342 & § 2342(1).  An FCC rule such as the EBR exemption is a "final order" for purposes of § 2342.  *See Biggerstaff*, 511 F.3d at 184-85 (applying § 402(a) and § 2342 to review of the EBR exemption); *see also City of*

14

*Peoria* v. *Gen. Elec. Cablevision Corp. (GECCO)*, 690 F.2d 116, 119 (7th Cir. 1982) (holding

that FCC rules are final orders governed by § 402(a)).  Furthermore, following the FCC's release

of a report, such as the 1992 Report and Order, a party "whose interests are adversely affected"

by the report must petition the FCC for reconsideration *before* seeking judicial review of the

report if the aggrieved party "was not a party to the proceedings resulting in such . . . report."  47

U.S.C. § 405(a).

CE Design cannot sidestep Congress's jurisdictional bar by seeking to challenge Penton's

EBR defense in this Court.  If CE Design wants to challenge the validity of the EBR exemption

it is required to petition the FCC[9] and then seek review of the FCC's decision in the Court of

Appeals.  *See GECCO*, 690 F.2d at 120-21; *see also* 47 U.S.C. § 405(a); *id.* § 402(a).  As the

Seventh Circuit Court of Appeals has explained:  "[T]he proper procedure [is] for the district

judge to stay the proceeding before him while [the plaintiff] [goes] to the FCC for a

determination of the validity and application of the rule." *GECCO*, 690 F.2d at 120.

This procedure, mandated by Congress, is "equally applicable whether [CE Design]

wants to challenge the rule directly . . . or by suing someone who can be expected to set up the

rule as a defense in the suit."  *GECCO*, 690 F.2d at 120.  "By its terms, [the statute's]

jurisdictional limitations apply as much . . . to affirmative defenses as to offensive claims."

*United States* v. *Dunifer*, 219 F.3d 1004, 1007 (9th Cir. 2000).   In other words, Congress's

decision to lock the door to district court review of FCC rules should not be mistaken as an

invitation to climb through the window.  And Congress's jurisdictional bar would apply with

equal force if CE Design were to raise a *Chevron* challenge.  *See Qwest Corp.* v. *FCC*, 482 F.3d

---

[9] The 1992 Report and Order indicates that CE Design was not a party to the FCC's proceedings.  *See*
1992 Report and Order App'x A.  CE Design is therefore bound by the petition requirement of 47 U.S.C.
§ 405(a).

34516.DOC

471, 475 (D.C. Cir. 2007) (holding that § 405(a) applies to "all questions of fact or law" regardless of whether the FCC decision is entitled to *Chevron* deference).[10]

2.   <u>Any challenge to the EBR exemption would be untimely</u>

Even if CE Design were to comply with § 405 and binding Seventh Circuit precedent and seek a stay of this action to obtain review of the EBR exemption in the FCC or the Court of Appeals, such review would be untimely and therefore futile.

In *GECCO*, the Seventh Circuit explained that "once the defense [based on FCC rule] was pleaded, the proper procedure was for the district judge to stay the proceeding before him while [the plaintiff] went to the FCC for a determination of the validity and application of the rule." 690 F.2d at 120. Under the law, any such challenge to the EBR must have been made within 60 days of the FCC's publication of the 1992 Report and Order. *See* 28 U.S.C. § 2344 (providing limitations period); *see also Biggerstaff*, 511 F.3d at 185 (stating that challenges to the EBR exemption are governed by § 2344 and holding the plaintiff's challenge untimely). But here, CE Design would seek to challenge a rule promulgated over 15 years ago. The time for challenge has long since passed.

The enforcement of this statutory 60-day limitations period is crucial in light of the wide-spread reliance on FCC rules. Companies and individuals across the country order their affairs and conduct their businesses based on the understanding that the FCC's rules are the law of the land. This case provides an example of that reliance. For 13 years after the 1992 Report and Order (until Congress passed the JFPA in 2005) Penton and companies like it relied on the

---

[10] Although there are a few cases in which state courts or district courts in other circuits – in clear violation of Congress's grant of exclusive jurisdiction to the Courts of Appeals – have heard challenges to the FCC's EBR exemption, none of those cases addressed the jurisdictional bar. *See*, *e.g.*, *Weitzner* v. *Iridex Corp.*, No. 05 Civ. 1254, 2006 WL 1851441, at \*5 & n.7 (E.D.N.Y. June 29, 2006), and *Leckler* v. *Cashcall, Inc.*, 554 F. Supp. 2d 1025 (N.D. Cal. 2008). Nor were those courts bound by the Seventh Circuit's holding in *GECCO*.

34516.DOC

FCC's EBR exemption in ensuring that their communications with clients and subscribers were in accordance with the law.  Over that 13-year period, numerous companies sent countless faxes based on the expectation that the FCC's rules and exemptions governed their behavior.  By requiring that a party must first petition the FCC before challenging an FCC rule and then centralizing review of FCC decisions in the Courts of Appeals, Congress further solidified this widespread expectation and reliance.  It would insult the rule of law to allow a plaintiff – 15 years after the promulgation of an FCC rule – to seek to invalidate the rule and then recover millions of dollars from a defendant who had for years acted in good faith in accordance with the rule's mandate.  Although that is exactly what CE Design would hope to accomplish in this litigation, the limitations period of § 2344 does not allow it.

3.     <u>The EBR exemption is valid</u>

Putting aside the jurisdictional barriers, any challenge to the FCC's EBR exemption would fail because the EBR exemption was a proper exercise of the FCC's implementation authority.  Congress empowered the FCC to "prescribe regulations to implement the" TCPA.  TCPA § 3(c), 105 Stat. at 2402.  The FCC promulgated the EBR exemption pursuant to that congressional grant of power and therefore this Court should apply the exemption.

Courts that have properly heeded Congress's jurisdictional limitation have recognized the propriety and force of the FCC's EBR exemption.  For example, in *Eclipse Mfg. Co.* v. *M & M Rental Ctr., Inc.*, a court in this District recognized that even prior to the JFPA, "it would have been lawful for [the defendant] to send [an] advertisement if it had an established business relationship with [the plaintiff]." 2006 WL 1547993, at *4.  That is because the FCC's EBR exemption "would have been in force prior to the enactment of the JFPA."  *Id.*; *see also Accounting Outsourcing, LLC* v. *Verizon Wireless Personal Commc'ns, L.P.*, 329 F. Supp. 2d 789, 808 (M.D. La. 2004) (acknowledging the force of EBR exemption during the ten years prior

17

to the JFPA); *Texas* v. *Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 896-97 (W.D. Tex. 2001) (recognizing the applicability of the FCC's EBR exemption).

State courts, mindful of the Courts of Appeals' exclusive jurisdiction, have reached similar results. In *Carnett's, Inc.* v. *Hammond*, the Georgia Supreme Court applied the EBR exemption – for the simple reason that the FCC compelled it to do so. 610 S.E.2d 529, 531 (Ga. 2005). In reaching this conclusion, the *Carnett's* Court cited various FCC reports and orders, *see id*. at 531 n.17, and expressly invoked the jurisdictional limitation of 28 U.S.C. § 2342, *id*. at 531 n.18.[11]

In addition, the EBR exemption is consistent with congressional intent. When Congress passed the JFPA in 2005, it was the stated "purpose of this legislation [the JFPA] to preserve the established business relationship exception currently recognized under the TCPA." Statement of Sen. Gordon Smith, Testimony before Sen. Com. on Commerce, Science, and Transportation, Subcom. on Consumer Affairs, Foreign Commerce and Tourism (Apr. 13, 2005), *available at* 2005 WL 853590. This is because, as the FCC recognized in 1992, "a solicitation to someone with whom a prior business relationship exists does not adversely affect subscriber privacy interests," and "the TCPA does not intend to unduly interfere with ongoing business relationships." 1992 Report and Order ¶ 34, p. 8770; *see also id*. n.87 (citing to ¶ 34 as support for EBR exemption for facsimile advertisements).

Congress's subsequent action further confirms the validity of the EBR exemption. The JFPA, with its statutory EBR exemption, was passed in response to the FCC's stated intention to

---

[11] The Supreme Court of North Dakota reached the same conclusion in rejecting a challenge to a different FCC rule: "Unless the FCC's rulings and regulations have been appropriately challenged in the proper federal forum, we are not at liberty to review the FCC's statutory interpretation even if we doubted its soundness, and we must apply the rulings and regulations as written. Because the FCC's regulations and rulings are not subject to collateral attacks, whether the FCC has exceeded the authority granted by Congress . . . is a question the Commission and this Court have no jurisdiction to consider." *Consol. Tel. Coop.* v. *W. Wireless Corp.*, 637 N.W. 699, 707 (N.D. 2001).

34516.DOC

reverse its regulatory EBR exemption. *See* 2003 Report and Order ¶ 189, p. 14,127. The FCC delayed the implementation of its reversal to allow Congress decide the issue, and Congress's desire to continue the EBR exemption trumped the FCC's intentions. Congressional ratification of prior FCC action affirms even rules that were unauthorized when promulgated. *See Food & Drug Admin.* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 157-59 (2000) (discussing Congress's ratification of prior agency position); *see also Schism* v. *United States*, 316 F.3d 1259, 1289 (Fed. Cir. 2002) ("Congress may ratify agency conduct giving the force of law to official action unauthorized when taken."). Here, Congress's ratification of the EBR exemption confirms the exemption's validity prior to the enactment of the JFPA.

### B. The EBR Exemption Applies to CE Design

In prior litigation, some TCPA plaintiffs (including those represented by CE Design's counsel in this action) have claimed that the EBR exemption applies to faxes sent to residences but not those sent to businesses. If, as is likely, CE Design raises this argument in response to Penton's motion, this Court should reject it. The argument has no basis in law and is predicated on a gross misreading of FCC rules.

Specifically, the "residential only" argument requires the Court improperly to cherry-pick selected language from FCC rules. In 2003, the FCC provided a definition of an EBR in the context of the EBR defense related to automated telephone calls, which included the phrase "between a person or entity and a residential subscriber." 2003 Report and Order App'x A., p. 14,148. The "residential only" argument finds its source in the definition's use of the phrase "residential subscriber" and thereby seeks to apply that limitation to the EBR exemption for facsimile advertisements.

But this argument ignores the definition's prefatory language, which states that it applies only "as used in *this section*." *Id*. (emphasis added). The EBR exemption for facsimile

advertisements is not found in "this section," which provides the EBR exemption solely for automated telephone calls. Rather, the EBR exemption for faxes is found in the 1992 Report and Order and in the FCC's subsequent ratification in the 1995 Report and Order. *See* 1995 Report and Order ¶ 37, p. 12,408 ("[T]he existence of an established business relationship establishes consent to receive telephone facsimile advertisement transmissions."). The relevant portions of the 1992 Report and Order and the 1995 Report and Order contain no "residential" limitation.

The FCC's own implementation of the EBR exemption for faxes further undermines any attempt to limit the exemption to residences. When, in 2003, the FCC considered reversing its EBR exemption for faxes, it recognized that "home-based businesses *and other companies*" were complaining that "facsimile advertisements interfere with receipt of faxes connected to their own *business*." 2003 Report and Order ¶ 186 (emphasis added). Ultimately, the FCC concluded that "consumers *and businesses* receive faxes they believe they have neither solicited nor given their permission to receive." *Id*. ¶ 189 (emphasis added). Based on the 2003 Report and Order it is clear that the FCC interpreted its EBR exemption for faxes to apply both to residences and to businesses. An agency's interpretation of its own rules and procedures is given "substantial deference." *Heartwood, Inc.* v. *U.S. Forest Serv.*, 230 F.3d 947, 953 (7th Cir. 2000).

In sum, it is clear that neither the TCPA nor the FCC's rules limit the EBR exemption to residential fax users.

34516.DOC

## CONCLUSION

A rational trier of fact would conclude that in August 2004, when CE Design received the facsimile that forms the basis of its claim, CE Design and Penton had an established business relationship.  Because this established business relationship provides a complete defense to CE Design's TCPA claim, Penton is entitled to judgment in its favor as a matter of law.


Dated:    September 8, 2008                              Respectfully submitted,

                                                        By    /s/  Theresa Trzaskoma
                                                           Theresa Trzaskoma (admitted *pro hac vice*)
                                                           BRUNE & RICHARD LLP
                                                           80 Broad Street
                                                           New York, NY  10004
                                                           (212) 668-1900
                                                           ttrzaskoma@bruneandrichard.com


                                                           Rebecca L. Ross
                                                           David F. Cutter
                                                           ROSS, DIXON & BELL, LLP
                                                           55 West Monroe Street, Suite 3000
                                                           Chicago, IL  60603-5758
                                                           (312) 759-5556
                                                           rross@rdblaw.com
                                                           dcutter@rdblaw.com

                                                           *Counsel to Defendant*

34516.DOC