**NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CE DESIGN LTD., )
)
Plaintiff, )
)
v. ) No. 07 C 5838
)
PRISM BUSINESS MEDIA, INC., ) Judge Rebecca R. Pallmeyer
)
Defendant. )

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff CE Design Ltd. ("CE Design") brings this action against Defendant Prism Business Media, Inc. ("Prism")[1] alleging violations of the Telephone Consumer Protection Act ("TCPA"), which prohibits, among other things, the sending of unsolicited fax advertisements without the recipient's "prior express invitation or permission." 47 U.S.C. § 227. Plaintiff filed suit as a putative class action on August 16, 2007 in the Circuit Court of Cook County, Illinois, and Defendant timely removed the case to this court on the basis of federal question jurisdiction, 28 U.S.C. § 1331, and, alternatively, on the basis of diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). ("Notice of Removal" [1] ¶¶ 1, 4.)

The facts are largely undisputed. On August 23, 2004, Defendant faxed an advertisement to Plaintiff at its place of business in Rolling Meadows, Illinois. At the time, Plaintiff subscribed to several trade magazines published by Defendant, and Defendant used a fax number Plaintiff had voluntarily supplied in conjunction with these subscriptions. Plaintiff alleges that the fax advertisement was sent without its express permission in violation of the TCPA and pursuant to Defendant's "policy and practice of faxing unsolicited advertisements to persons in Illinois and other states." (Compl. ¶¶ 1, 2.) In response, Defendant asserts that its conduct falls within an exception

---

[1] The Complaint named "Prism Business Media, Inc." as the Defendant when this action was commenced in August 2007, although Prism had changed its name to Penton Business Media, Inc. on March 15, 2007. To avoid confusion, the court uses Defendant's name as it appears in the Complaint's caption.

to the TCPA's prohibition on unsolicited fax advertisements where the sender and recipient have an "established business relationship" ("EBR"), and that such a relationship constitutes a complete defense to liability. Defendant has moved for summary judgment, and for the reasons discussed below, its motion is granted.

## FACTUAL BACKGROUND[2]

**The Parties**

Prism is a "business-to-business media company," incorporated in Delaware and with its principal place of business in New York City. (Def. 56.1 ¶ 1.) As a business-to-business (as opposed to direct-to-consumer) media publisher and supplier, Prism publishes more than 100 trade magazines and electronic newsletters, and sponsors national industry-specific trade shows both in the United States and abroad. (Def. 56.1 ¶ 5.) Prism's publications have a current circulation of more than five million readers, which include both business and individual subscribers. (Def. 56.1 ¶ 6.) Prism solicits new subscribers by placing subscription cards in publications, contacting potential subscribers through telemarketing campaigns, promoting its publications at trade shows, and making offers through direct mail, by phone, and over the internet. (Def. 56.1 ¶ 7.) A new subscription record is created when a potential subscriber accepts Prism's solicitation and is "qualified," that is, the subscriber meets a specific demographic profile for a free subscription. (Def. 56.1 ¶ 9.) Prism maintains demographic information on its subscribers, including the nature of the individual subscriber's business, its title, company size, and purchasing authority. (Def. 56.1 ¶ 8.) Since 2003, Prism has used Hallmark Data Systems, Inc. ("Hallmark") as its "circulation fulfillment vendor," a role which entails maintaining and updating Prism's subscription lists by storing subscription source documents in accordance with BPA's audit requirements, managing subscriber accounts, and updating subscriber databases with information obtained from Prism's telemarketing,

---

[2]     Unless otherwise indicated, the court draws the facts of this case from the parties' Local Rule 56.1 Statements.

direct mail, and e-mail vendors.  (Def. 56.1 ¶¶ 13-14.)

Each year, Prism "requalifies" subscribers to confirm that their subscription data is accurate and that they wish to continue receiving the publication or publications to which they subscribe. (Def. 56.1 ¶ 15.)  The process of requalification entails contacting the subscriber using various methods, including telemarketing campaigns, subscription renewal cards, and solicitations through e-mail or over the internet.  (Def. 56.1 ¶ 16.)  If a subscriber fails to requalify for two consecutive years, the subscription is canceled, and the subscriber is removed from the publication's subscription list.  (Def. 56.1 ¶ 54.)

CE Design is an Illinois corporation with its principal place of business in Rolling Meadows, Illinois. (Def. 56.1 ¶ 2.)  Although CE Design does not specify its business in the pleadings, the court has located a website in the company's name, describing it as a professional civil engineering and design firm that offers its services "throughout the Midwest including Illinois, Indiana, Kentucky, Michigan, Minnesota, Ohio, Pennsylvania, and Wisconsin."  *See* http://www.cedesignltd.com (last visited Aug. 6, 2009).  John Pezl is CE Design's president and sole shareholder.  (Def. 56.1 ¶ 33.)

**The Parties' Business Relationship**

CE Design admits that it subscribed to no fewer than three of Defendant's publications between 1999 and 2008.  (Pl. 56.1 Resp. ¶¶ 37-40, 42-43, 45-46, 48, 53-54, 56-58, 61, 64.) According to Prism's records, in December 1999, Pezl filled out a subscription card for "American City & Country" ("AC&C"), a publication "serving the field of municipal and county government including mayors, city and county managers, city and county engineers, and related companies such as consulting engineering firms and other independent contractors."  (Def. 56.1 ¶¶  36, 38.) On the subscription card, Pezl provided CE Design's address, phone number, and fax number, and affirmed that the subscription was in his name as the president of CE Design.  (Def. 56.1 ¶ 38.) Thereafter, Pezl renewed CE Design's subscription by submitting a subscription renewal card each year from 2000 through 2006 and again in 2008.  In 2007, CE Design renewed its subscription via

3

the internet. (Def. 56.1 ¶ 39.)

According to Prism's records, from 2002 through 2005, CE Design subscribed to "Electrical Construction & Maintenance" ("EC&M"), a publication that provides technical information to electrical professionals, such as electrical contractors, industrial plants, and consulting electrical engineers. (Def. 56.1 ¶ 44, 45-54.) Again, the subscription was in Pezl's name as president of CE Design, and Prism's records show that Pezl provided CE Design's address, phone, number, and fax number. (Def. 56.1 ¶ 45.) In 2003 and 2004, an independent telemarketing firm employed by Prism confirmed CE Design's subscription information. (Def. 56.1 ¶ 48.) In 2005 and 2006, CE Design failed to requalify for a subscription to EC&M, and Prism removed CE Design from its EC&M subscription list in 2006 pursuant to its standard practice. (Def. 56.1 ¶¶ 53-54)

Finally, Prism's records indicate that from 2003 through 2007, CE Design subscribed to "Retail Traffic," a publication with a focus on real estate and whose subscribers include developers, owners, retailers, brokers, architects and lenders. (Def. 56.1 ¶ 55, 57.) As with its subscriptions to AC&C and EC&M, the subscription was in Pezl's name as president of CE Design, and Prism's subscriber record included CE Design's address and telephone number, but not its fax number. (Def. 56.1 ¶¶ 58-59.) CE Design renewed its subscription by phone in 2004, by mailing in two subscription cards signed by Pezl in 2005, and via the internet in 2006 and 2007. (Def. 56.1 ¶¶ 61, 64.)

**The Electrical West Fax**

On August 23, 2004, Prism sent a fax to CE Design and other subscribers, advertising an upcoming trade show called "Electrical West." (Def. 56.1 ¶ 67.) Prism sent the fax to "J Pezl" at "CE Design Ltd," using the fax number provided in connection with the AC&C and EC&M subscriptions. (Def. 56.1 ¶ 68.) The fax included a notice inviting the recipient to write "remove" on the face of the advertisement and fax it back toll-free at the number provided if the recipient believed it had received the fax "in error" and wished to unsubscribe. (Pl. 56.1 Resp. ¶ 69.) CE Design never

sought to unsubscribe before or after Defendant sent the August 23, 2004 fax. (Def. 56.1 ¶ 70.) CE Design has not alleged that Prism sent any other unsolicited fax advertisements to its fax machine before or since the August 23, 2004 fax.

## DISCUSSION

In its single claim in this case, Plaintiff alleges that Defendant violated a provision of the TCPA that prohibits the "use of any telephone facsimile machine, computer or other device to send an unsolicited advertisement to a telephone facsimile machine."[3] 47 U.S.C. 227(b)(1). The statute provides a private right of action for injunctive relief and/or damages for a violation of 47 U.S.C. 227(b). The TCPA is a strict liability statute, but the court has discretion to award treble damages for a willful or knowing violation of 47 U.S.C. 227(b).

Plaintiff alleges that "[o]n or about August 23, 2004, Defendant transmitted by telephone facsimile machine an unsolicited advertisement to Plaintiff's facsimile machine," and that "Defendant knew or should have known (i) Exhibit A [the August 23, 2004 fax advertisement] was an advertisement and (ii) Defendant did not have permission or invitation to send Exhibit A to Plaintiff and the other members of the class." (Compl. ¶¶ 11,12.) Plaintiff claims it suffered damages in the form of the cost of the paper and toner consumed when Defendant transmitted the fax advertisement and in employee time lost in the receipt, routing, and review of Defendant's faxes. (Compl. ¶ 26.) Plaintiff alleges that it is a member of a larger class that has suffered similar harm as a result of Defendant's actions. (Compl. ¶ 16.)

Defendant admits that it faxed an advertisement to Plaintiff on August 23, 2004 and that it did so without Plaintiff's express permission. Defendant contends that it is nonetheless not liable under the TCPA because an "established business relationship" ("EBR") existed between Prism

---

[3] Previously, Plaintiff voluntarily dismissed, without prejudice, its claims for common law conversion and for consumer fraud under Illinois' Deceptive Business Practices Act, 735 ILCS 5/2-801. (*See* Minute Entry, Oct. 26, 2007 [Doc. 25].)

and CE Design by virtue of CE Design's voluntary subscriptions to Prism publications. This so-called "EBR exemption" to the TCPA's general prohibition of unsolicited fax advertisements does not appear in the TCPA itself. Rather, it is a creature of the FCC's rulemaking powers, and its validity and application was the subject of some contention prior to 2005, when Congress passed the Junk Fax Protection Act ("JFPA"), amending the TCPA to codify the EBR exemption. *See* Junk Fax Prevention Act of 2005 § 2(a), Pub. L. No. 109-21, 119 Stat. 359. As it is currently drafted, the JFPA exempts from the statute's prohibition on unsolicited fax advertisements any advertisements "from a sender with an established business relationship with the recipient." 47 U.S.C. § 227(b)(C)(i)). Because the alleged violation occurred before the adoption of the JFPA, in this case the court must apply the law as it existed before the passage of that Act.

Plaintiff does not dispute that it has a an "established business relationship" with Defendant under the TCPA. Instead, Plaintiff presents two arguments in opposition to summary judgment, both of which challenge the application of the EBR exemption for fax advertisements. First, Plaintiff contends that the FCC exceeded its rule-making authority and contradicted the plain language of the TCPA in promulgating the EBR exception. Plaintiff suggests that the court has authority under *Chevron* to ignore, without invalidating, the FCC's erroneous interpretation of the clear and unambiguous language of the TCPA. Second, Plaintiff argues that even if the EBR exemption is a valid exercise of the FCC's rulemaking authority, Defendant is nonetheless subject to liability because the defense apples only to residential subscribers, not business subscribers, and CE Design is a business.

**The FCC's Recognition of an EBR Exemption**

The genesis of the EBR exemption is somewhat uncertain, and its recognition and application by courts has been far from consistent. By way of background, the court begins with the exemption's legislative origins before proceeding to address its application in this case. On December 20, 1991, Congress enacted the TCPA, to prohibit, among other things, the use of

telephone facsimile machines, computers, and other similar devices to send unsolicited advertisements to consumers. *See* TCPA, Pub L. No. 102-243 § 3(a), 105 Stat. 2394, 2396 (1991) (current version at 47 U.S.C. § 227(b)(1)(c)). The statute defined "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." *Id.* § 3(a), 105 Stat. at 2395. Included in the original Act was a provision empowering the FCC to promulgate rules and regulations to implement the TCPA. *Id.* § 3(c), 105 Stat. at 2397 ("Within 120 days after the date of enactment of this section, the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object.")

Following the TCPA's enactment, the FCC began promulgating rules and regulations, including language that contemplated limitations on liability for faxes sent pursuant to a preexisting business relationship. In a 1992 Report and Order, the FCC acknowledged the TCPA's explicit ban on unsolicited fax advertisements, but noted that "facsimile transmission from persons or entities who have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient." *In Re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* [hereinafter "1992 Report and Order"], 7 F.C.C.R. 8752, 8779 n.87 (Oct. 16, 1992). In recognizing this exception for existing business relationships, the FCC explained that the statute's legislative history supported the conclusion that "a solicitation to someone with whom a prior business relationship exists does not adversely affect subscriber privacy interests" and, further, that "the TCPA does not intend to unduly interfere with ongoing business relationships." *Id.* at 8770. The FCC observed, however, that an EBR may be terminated by the recipient's request to terminate future communications. *Id.* at 8784 n.47.

Despite this apparent acknowledgment of an EBR exemption for fax advertisements, the FCC did not explicitly incorporate such an exemption into its final rules issued on October 23, 1992.

Rules and Regulations, 57 Fed. Reg. 48,333, 48,335 (Oct. 23, 1992). In those rules, the FCC merely recognized an EBR exemption for automated or prerecorded telephone calls to residences, and defined an EBR as follows:

> The term "established business relationship" means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

*Id.* The Rules' language regarding fax machines simply reads, "No person may . . . use a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." *Id.* There is no explicit mention of an EBR exemption for fax advertisements.

In the FCC's view, however, the matter was settled with respect to faxes as well. In 1995, in response to challenges of vagueness from petitioners seeking reconsideration of the 1992 Report and order, the FCC stated that "[The 1992 Report and Order] makes clear that the existence of an established business relationship establishes consent to receive telephone facsimile advertisement transmissions.*" In Re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* [hereinafter "1995 Report and Order"], 10 F.C.C.R. 12391, 12408 (Aug. 7, 1995).

So matters stood until 2003, when the FCC revisited the EBR exemption once again, this time to propose eliminating its application to fax advertisements. In a 2003 Report and Order, the FCC stated,

> We now reverse our prior conclusion that an established business relationship provides companies with the necessary express permission to send faxes to their customers. As of the effective date of these rules, the EBR will no longer be sufficient to show that an individual or business has given their express permission to receive unsolicited facsimile advertisements.

*In Re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* [hereinafter "2003 Report and Order"], 18 F.C.C.R. 14,014, 14127 (June 26, 2003). The new rule was never implemented, however, because the FCC delayed its effective date after learning that

Congress intended to act on the issue. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 16,972 (Aug. 18, 2003); *see Biggerstaff v. FCC*, 511 F.3d 178, 182 (D.C. Cir. 2007) (describing the history of the TCPA's EBR exemption).

When Congress did act, in 2005, it chose to codify the EBR exemption for faxed advertisements in the JFPA. *See* JFPA, 47 U.S.C. § 227(b)(C)(i)) (recognizing an exemption from liability under the TCPA for unsolicited fax advertisements "if the unsolicited advertisement is from a sender with an established business relationship with recipient"). The JFPA thus explicitly adopted the defense for fax advertisements sent to business subscribers, with whom the sender has an established business relationship, and, consequently, the FCC's proposed 2003 rule eliminating the EBR exemption was never implemented. *See id.* at § 227(a)(2)(A); Statement of Sen. Gordon Smith, Testimony Before Senate Committee on Commerce, Science, and Transportation, Subcommittee on Consumer Affairs, Foreign Commerce and Tourism (Apr. 13, 2005), *available at* 2005 WL 853590 ("The purpose of this legislation is to preserve the established business relationship exception currently recognized under the TCPA.") The JFPA came into effect after the alleged violation in this case, however, and the court must look at the law as it existed when Defendant sent Plaintiff the fax advertisement on August 23, 2004.

**Statutory Bar to District Court Review of the EBR Exemption**

Plaintiff contends that the FCC's EBR exemption for fax advertisements is an arbitrary and unreasonable interpretation of the TCPA that should not be available as a defense in this case. Before reaching the merits of this argument, the court must first address whether it may consider the validity of the FCC's 1992 interpretation of the TCPA or whether the Hobbs Act prevents it from second-guessing the Commission's recognition of an EBR exception for fax advertisements.

Ordinarily, courts reviewing agency action must apply the principles of *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, the court asks first whether a statute is silent or ambiguous with respect to the agency decision at issue. *See City of*

9

*Chicago v. F.C.C.*, 199 F.3d 424, 427 (7th Cir. 1999). If Congress has spoken directly to the issue, then "that is the end of the matter," and the language of the statute is the law. *Chevron*, 467 U.S. at 842. If, however, congressional intent is unclear or the statute is silent, the court decides "whether the agency's determination is based on a permissible construction of the statute." *City of Chicago*, 199 F.3d at 428. Under the Administrative Procedure Act ("APA"), the court will defer to the agency's interpretation of an ambiguous statute unless it is "arbitrary [or] capricious." *See* 5 U.S.C. § 706.

This general power to review administrative action may, however, be circumscribed or even foreclosed by statute. When the FCC rules on telephone and telegraph matters, Congress has limited the availability of judicial review to the federal courts of appeals. Chapter 158 of title 28, called the Administrative Orders Review Act, reserves to the courts of appeals (other than the Court of Appeals for the Federal Circuit) the power "to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the [FCC] made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342 and § 2342(1); *see Biggerstaff*, 511 F.3d at 184-85 (applying § 402(a) and § 2342 in action challenging the validity of the 1992 EBR exemption). Section 402(a) in turn provides that in "any action to enjoin, set aside, annul, or suspend any order of the [FCC]," judicial review "shall be provided by and in the manner prescribed in chapter 158 of title 28." 47 U.S.C. § 402(a). Together, the Administrative Orders Review Act and § 402(a) "vest the courts of appeals with exclusive jurisdiction to review the validity of FCC rulings." *US West Commc'ns, Inc. v. Hamilton*, 224 F.3d 1049, 1054 (9th Cir. 2000); *see City of Peoria v. Gen. Elec. Cablevision Corp. (GECCO)*, 690 F.2d 116 (7th Cir. 1982) ("Proceedings for judicial review of final orders of the FCC . . . may be brought only in a federal court of appeals." (citations omitted)). In short, a petitioner challenging the validity of an FCC order may seek review of that order only in a federal court of appeal. *See Fed. Commnc'ns Comm'n. v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984) ("Litigants may not evade these provisions by requesting the District Court to enjoin action that is

the outcome of the agency's order." (citing 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a)); *Columbia Broadcasting Sys. v. United States*, 316 U.S. 407, 425 (1942) (discussing application of the Administrative Orders Review Act and § 402(a) to final orders of the FCC). Further, if the petitioner "was not a party to the proceedings resulting in such order, decision, report, or action" and therefore was not entitled to direct appeal, it must first petition the FCC for reconsideration before seeking judicial review. 47 U.S.C. § 405(a); *see WWC Holding Co., Inc. v. Sopkin*, 488 F.3d 1262, 1273 (10th Cir. 2007) (recognizing the Act's prescribed procedure for challenging FCC rulings and noting that "we must assume the FCC's order . .. is valid under the Telecommunications Act" unless that procedure has been invoked).

In its Response to Defendant's Motion to Dismiss, Plaintiff inverts this analysis, arguing that the Administrative Orders Review Act comes into play only after the court applies Step One of the *Chevron* analysis and concludes that the statute is ambiguous or silent as to the disputed issue. Even then, Plaintiff asserts, limitations on the court's review power are effective only if the action is a "direct attack against the FCC's rules to actually strike them down." (Pl. Resp. 17-18.) Under Plaintiff's approach, a finding that the TCPA is unambiguous regarding unsolicited fax advertisements obviates any need to resort to the FCC's interpretation. Plaintiff cites several cases in support of its analysis, but each of them is distinguishable from this case. (*Id.* 14-15.) In *Bell Atlantic Mobile, Inc. v. Dept. of Pub. Util. Control*, 754 A.2d 128 (Conn. 2000), the Connecticut Supreme Court addressed whether certain amendments to the Telecommunications Act preempted the state's ability to require cellular service providers to contribute to its universal telephone service program. Unlike Plaintiff in the case before this court, the appellant in *Bell Atlantic Mobile* was not challenging an FCC interpretation of a federal statute, but rather had appealed from a state agency's decision upholding that agency's power to impose universal service assessments on interstate cellular service providers. The state agency's decision was based on both the language of the Telecommunications Act itself and an FCC order adopting the recommendations of a federal-

state joint board convened pursuant to the amended Act. The Connecticut Supreme Court, applying *Chevron*, considered the FCC's ruling only to note that it supported the state agency's interpretation that state regulation was not preempted. *Id.* at 481, 481 n.14, 754 A.2d at 144. The court did not consider the applicability of the Administrative Orders Review Act because the plaintiff challenged the action of a state agency as preempted by a federal statute; the FCC's interpretation was not directly at issue.

In *Witzner v. Iridex*, No. 05 Civ. 1254, 2006 WL 1851441, at *1 (E.D.N.Y. June 29, 2006), also cited by Plaintiff, the magistrate judge recommended that the district court invalidate the EBR exemption as contrary to congressional intent, but made no mention of the Administrative Orders Review Act in its analysis. *Id.* at *7-*8. The court relied primarily on a Tenth Circuit decision applying the standard recited in the APA for general judicial review of agency decisions. *Id.* (citing *Mainstream Mktg. Servs., Inc. v. Federal Trade Comm'n*, 358 F.3d 1228, 1248 (10th Cir. 2004)). The magistrate judge failed, however, to consider the APA's provision excluding its application where a statute explicitly precludes review or where a statute specifies a particular court as the appropriate court of review for a particular subject matter. 5 U.S.C. §§ 701(a), 703. In the case of the TCPA, the Administrative Orders Review Act and § 402(a) explicitly identify the courts of appeals as having exclusive authority to determine the validity of FCC final orders.[4]

Plaintiff's remaining authorities similarly fail to consider the jurisdictional bar posed by the Administrative Orders Review Act or else have reconsidered their original position since Plaintiff filed its response brief. *Leckler v. Cashcall, Inc.* (*"Leckler I"*), 554 F. Supp. 2d 1025 (N.D. Cal. 2008), cited by Plaintiff for its "sound reasoning," was vacated in November 2008 once the district court became aware of the effect of the Act. *See Leckler v. Cashcall, Inc.* (*"Leckler II"*), No. C 07-

---

[4]     The court notes that *Witzner* did not proceed beyond the magistrate judge's recommendation, and thus the district court did not have the opportunity to adopt or reject its opinion.

04002, 2008 WL 5000528, at *2 (N.D. Cal. Nov. 21, 2008). *Leckler II* concluded in light of the Administrative Orders Review Act that it lacked subject matter jurisdiction to review an FCC declaratory ruling on a provision of the TCPA and vacated its previous order invalidating the declaratory ruling under *Chevron. Id.* Plaintiff also accords undue weight to *Spring Spectrum, L.P. v. State Corp. Comm'n*, 149 F.3d 1058 (10th Cir. 1998), in which the Court of Appeals applied *Chevron* in considering the narrow issue of whether the district court had properly denied the plaintiff injunctive relief from the enforcement of a state agency's interpretation of a federal statute; the district court below was not confronted with the validity of the FCC's interpretation of the statute in making its ruling. *See Mountain Solutions, Inc. v. State Corp. Com'n,* 966 F. Supp. 1043 (D. Kan. 1997).

In the recently decided *Blitz v. Agean, Inc.*, 677 S.E.2d 1 (N.C. App. 2009), also cited by Plaintiff, the primary issue on appeal was the trial court's denial of class certification under the TCPA. The North Carolina Court of Appeals based its rejection of the EBR exemption almost entirely on a four-paragraph excerpt from a decision by the Ohio Court of Common Pleas; that decision itself failed to address the availability of an EBR defense or any other relevant FCC rulings on the TCPA. *See Blitz*, 677 S.E.2d at 6-7 (quoting *Jemiola v. XYZ Corp.*, 126 Ohio Misc.2d 68, 802 N.E.2d 745, 748-49 (Ohio Com. Pl. 2003)). (These omissions become less remarkable if one reads the full opinion, which indicates that the defendant did not appear at the bench trial or submit any evidence in opposition to Plaintiff's TCPA claims.) Suffice it to say, this court finds the admittedly incomplete analysis of the Ohio Court of Common Pleas less than persuasive.

Finally, Plaintiff directs the court to a case from the Circuit Court of the City of St. Louis, unpublished and unavailable on Westlaw or LexisNexis, in which the municipal court invalidated the EBR exemption on the unsupported assumption that it possessed the authority to do so. *See Karen S. Little, L.L.C., v. Drury Inns, Inc.*, No. 22054-01928, at 77 (Mo. Cir. Mar 23, 2009) (Ex. A to Pl.'s Mot. for Leave to File Additional Persuasive Authority in Opp. to Def.'s Mot. for Summ. J.)

Although the court recognized that the ruling in *Leckler I* had been vacated, it nonetheless invoked the reasoning in that opinion and failed to acknowledge any possible bars to subject matter jurisdiction or even to address the existence of the Administrative Orders Review Act.

Despite these and similar cases that make no mention at all of the Administrative Orders Review Act, this court agrees with the Eighth Circuit that, "[i]t is hard to think of clearer language [than 28 U.S.C. § 2342] confining the review of regulations to the Courts of Appeal." *United States v. Any and all Radio Station Transmission Equip.*, 207 F.3d 458, 463 (8th Cir.2000), *cert. denied*, 531 U.S. 1071 (2001). More importantly, Plaintiff's approach is contrary to Seventh Circuit and other federal precedent regarding challenges to FCC orders. In *GECCO*, the City of Peoria brought an action in the Central District of Illinois to invalidate an FCC rule limiting cable franchise fees to three percent of gross revenues. *See* 690 F.2d at 118. The City did not participate in the original rule-making process but sought to have the rule declared invalid some years later, when its application affected Peoria's franchise agreement with the defendant. On appeal, the Seventh Circuit overturned the district court's assertion of jurisdiction over the action and its decision to hold an FCC rule invalid. *GECCO*, 690 F.2d at 119. The court wrote,

> Peoria's action against GECCO to declare the FCC's rule invalid was brought in the wrong court at the wrong time against the wrong party. Proceedings for judicial review of final orders of the FCC . . . may be brought only in a federal court of appeals. Administrative Orders Review Act, 28 U.S.C. s 2342(1); Communications Act of 1934, as amended, 47 U.S.C. ss 402(a),(b). If the party seeking review was not a party to the FCC's rulemaking proceeding, as the City of Peoria was not, it cannot get review by the court of appeals without first petitioning the FCC to reconsider the rule, 47 U.S.C. s 405, or at least, as we shall see, without seeking some kind of remedy from the agency.

*Id.* Similarly, in *Biggerstaff*, the D.C. Circuit Court of Appeals addressed a party's challenge to the 1992 Report and Order's creation of an EBR exemption. While the court concluded the party had standing to challenge the exemption, it nonetheless refused to consider the exemption's validity because the party had failed to petition the FCC prior to seeking judicial review:

> A procedural hurdle bars our consideration of Biggerstaff's contention that the court

should set aside the 1992 administratively-created EBR exemption because the Commission lacked authority to adopt it. Biggerstaff has not petitioned for a rulemaking to modify the 1992 EBR exemption, which "ordinarily" is "the appropriate way in which to challenge a longstanding regulation on the ground that it is 'violative of statute.'"

511 F.3d at 181-82 (quoting *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1214 (D.C.Cir.1996)). This procedure applies equally whether the petitioner "wants to challenge the rule directly . . ., or indirectly, by suing someone who can be expected to set up the rule as a defense to suit." *GECCO*, 690 F.2d at 119; *cf. United States v. Dunifer*, 219 F.3d 1004, 1007 (9th Cir. 2000) ("By its terms, the Communications Act's jurisdictional limitations apply as much as to affirmative defenses as to offensive claims.").

Finally, the court is mindful of the policy considerations behind the Administrative Orders Review Act. As the Eighth Circuit has noted, assigning exclusive jurisdiction in the courts of appeals "insures that review will be vested in an appellate panel and not in a single district judge," "guarantees that agency action will be reviewed on the basis of the administrative record rather than a district judge's de novo fact-finding," and "avoids the possibility of conflicting litigation where two courts have concurrent jurisdiction to resolve the same issues." *Southwestern Bell Tel. v. Ark. Pub. Serv.*, 738 F.2d 901, 906-07 (8th Cir.1984), *vacated and remanded on other grounds*, 476 U.S. 1167 (1986). These considerations furnish valid support for the Administrative Review Act's restriction on judicial review of FCC regulations.

**The EBR Exemption Is a "Final Order" for Hobbs Act Purposes**

Plaintiff next argues that the EBR exemption does not qualify as a "final order" within the meaning of the Administrative Orders Review Act. Again, the court is unconvinced. In *Gottlieb v. Carnival Corporation*, cited by Plaintiff, the court initially invalidated the FCC's interpretation of the TCPA as unreasonable, giving only cursory attention to the preliminary question of proper jurisdiction. Specifically, the court concluded that an "interpretation" is not equivalent to a "ruling" or "order" that may only be challenged under § 2342. 595 F. Supp. 2d 212, 219 n.5 (E.D.N.Y.

15

2009). The court noted that the FCC's interpretation "was not incorporated into the final rules" published in October 1992, which provided an exemption only for telephone calls, not fax advertisements. *Id.* at *4. Since then, the *Gottlieb* court has reconsidered its analysis and concluded that it "overlook[ed] some relevant authority." *Gottlieb v. Carnival Corp.*, — F. Supp. 2d —, No. 04-4202, 2009 WL 2151336, at *3 (E.D.N.Y. July 21, 2009). Reversing its original decision, the court most recently held that it "did not have jurisdiction to invalidate the EBR exemption and must apply it as if it were part and parcel of the TCPA." *Id.*

Contrary to Plaintiff's unsupported reasoning, it is not "[t]he particular label" assigned by the FCC that determines whether a decision is an order, but the "substance of what the Commission has purported to do and has done which is decisive." *Columbia Broadcasting*, 316 U.S. at 416 (1942). In *Columbia Broadcasting*, the Court defined orders reviewable under § 402(a) as distinct from other agency action insofar as such orders "are 'an exercise either of the quasi judicial function of determining controversies or of the delegated legislative function of rate making and rule making'." *Id.* at 420 (quoting *United States v. Los Angeles & S.L.R.*, 273 U.S. 299, 309-10 (1927). Both *GECCO* and *Biggerstaff* applied this principle in recognizing the EBR exemption as a "final order" for the purposes of review under the Administrative Orders Review Act, and other federal courts have followed this approach in analogous circumstances, as we do here. *GECCO*, 690 F.2d at 119 (holding that FCC rules are final orders governed by § 402(a)); *Biggerstaff*, 511 F.3d at 184-85 (applying § 402(a) and § 2342 to review of the EBR exemption); *see US West Commnc'ns*, 224 F.3d at 1054 ("agency orders are 'final orders' for the purposes of the Administrative Orders Review Act 'if they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process.'" (citing *Sierra Club v. United States Nuclear Regulatory Comm'n*, 862 F.2d 222 (9th Cir.1988)); *Leckler II*, 2008 WL 5000528, at *3 (agency decision is a "final order" where it is the final decision interpreting a statutory provision and "determines legal rights and obligations.")

The FCC's EBR exemption, though never codified in the Code of Federal Regulations ("C.F.R."), nonetheless meets the definition of a "final order." First, the assertion of the EBR exemption as a defense undoubtedly affects the rights of the parties in this suit. Depending on the exemption's validity and applicability to the facts, Defendant may either successfully assert it as a defense or else be subject to potential liability for sending unsolicited faxes without Plaintiff's express consent. Second, the history of the exemption, already discussed, reflects the FCC's intention to exercise its delegated rule-making authority in creating the exemption. Following notice and comment, the FCC promulgated the 1992 Report and Order, stating, "[F]acsimile transmission from persons or entities who have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient." 1992 Report and Order, app. B, 7 F.C.C.R. at 8779 ¶ 54, n.87, 1992 WL 690928, at *23. The FCC reaffirmed this interpretation in the 1995 Report and Order and again in the 2003 Report and Order, in which it proposed to eliminate the exemption. *See* 10 F.C.C.R. at ¶ 37; 18 F.C.C.R. at 14127 ¶ 189. In a ruling delaying the effective date of the 2003 Report and Order, the FCC explained,

> [w]e emphasize that our existing TCPA rules prohibiting the transmission of unsolicited advertisements to a telephone facsimile machine will remain in effect during the pendency of this extension. Under these rules, those transmitting facsimile advertisements must have an established business relationship or prior express permission from the facsimile recipient to comply with our rules.

Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 47 C.F.R. Part 64 (2004). In sum, the FCC has consistently recognized an EBR exemption to fax advertisements, beginning with the 1992 Report and Order and continuing through the enactment of the JFPA in 2005.

In addition to the FCC's own statements and actions, numerous federal courts have also recognized the EBR exemption as a valid final order prior to the enactment of the JFPA. A court in this district, interpreting the JFPA, acknowledged that prior to the JFPA's passage, "it would have been lawful for [the defendant] to send [an unsolicited fax] advertisement if it had an established

17

business relationship with [the plaintiff]." *Eclipse Mfg. Co. v. M and M Rental Ct., Inc.*, No. 06 C 1156, 2006 WL 1547993, at *4 (N.D. Ill. May 26, 2006) (Bucklo, J.)  Similarly, in *Accounting Outsourcing, LLC v. Verizon Wireless Personal Commc'ns, L.P.*, the Middle District of Louisiana noted, "For over ten years, the FCC's rule was that an established business relationship was deemed to be invited or permitted by the recipient" with respect to fax advertisements.  329 F. Supp. 2d 789, 808 (M.D. La. 2004); *see also Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 896-97 (W.D. Tex. 2001) (acknowledging the applicability of the FCC's EBR exemption to the general prohibition on sending interstate fax advertisements).  At least one state court has reached a similar conclusion.  *See Carnett's, Inc. v. Hammond*, 279 Ga. 125, 127 n.18, 610 S.E.2d 529, 531 n.18 (2005) (recognizing that state courts do not have jurisdiction to review final orders of federal agencies and must accept the FCC's EBR exemption as valid (citing 28 U.S.C. § 2324)).  In sum, courts over the years have accepted and applied the EBR exemption as a valid agency rule that affects the legal rights of parties to suit.  It therefore meets the definition of a "final order" for purposes of the Administrative Orders Review Act.

**Plaintiff Has Asked This Court To Determine the Validity of the EBR Exception**

Finally, Plaintiff contends that it is not asking this court "to enjoin, set aside, suspend . . . or to determine the validity of" any FCC order because this is "a civil case between two parties" that will have no effect on the FCC.  (Pl. Resp. at 14-15, 18.)  Plaintiff cites several cases that purportedly support this position.  First, Plaintiff relies on *WH Link, LLC v. City of Otesego*, 664 N.W.2d 390 (Minn. App. Ct. 2003) as an example of a case where a state court of appeals concluded it had jurisdiction to rule on plaintiff's preemption claims despite their conflict with certain FCC regulations.  *Id.* at 394.  The issue in *WH Link*, however, was preemption, and the court properly concluded that it had jurisdiction over any issues that Congress had not specifically directed to the FCC and, further, that the resolution of those issues did not require "interpretation of any FCC rule or regulation."  *Id.*

Plaintiff's reliance on *Cincinnati Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 466 N.E.2d 848 (Ohio 1984), is equally misplaced. In that case, the court, addressing the validity of an FCC preemption order, relied entirely on a four-paragraph excerpt from an Eastern District of Arkansas case, later reversed. *See Southwestern Bell Tel. Co. v. Ark. Pub. Serv. Comm'n*, 584 F. Supp. 1087 (E.D. Ark. 1984), *reversed by*, 738 F.2d 901 (8th Cir. 1984), *vacated on other grounds by*, 476 U.S. 1167 (1986). The court of appeals reversed the district court's decision in *Southwestern Bell* in part because it concluded the district court lacked jurisdiction under the Administrative Orders Review Act to declare certain FCC preemption orders as invalid. *Id.* at 906. The court specifically rejected the lower court's reasoning that a suit between private parties will not constitute an action "to enjoin or set aside an agency order," noting that "[w]here the practical effect of a successful attack on the enforcement of an order involves a determination of its validity, the statutory procedure for review provided by Congress remains applicable." *Id.* The court also pointed out that six other district courts had "properly declined to review the Order's validity."[5] *Id.* at 906 n.11.

As explained above, when a suit between private parties asks a court to consider the FCC's authority to promulgate an order in deciding whether or not to apply that order, it in effect requests the court to rule on that order's validity. *See GECCO*, 690 F.2d at 119 (suit against private party seeking to invalidate FCC order should have been brought against FCC in proceeding for judicial review before court of appeals). "Plaintiffs cannot avoid the proscriptions of Section 402 by claiming that they are not facially challenging the FCC's general delegation policy, but only its application" to the circumstances of a specific case. *Am. Bird Conservancy v. F.C.C.*, 408 F. Supp. 2d 987, 991 (D. Hawaii 2006); *see also Wilson v. A.H. Belo*, 87 F.3d 393 (9th Cir. 1996) ("A complaint [to recover alleged overcharges for political advertising in violation of the Communication

---

[5]     On grant of certiorari, the Supreme Court vacated the Eighth Circuit's decision in light of its holding in *Louisiana Public Service Commission v. F.C.C.*, 476 U.S. 355 (1986), in which the Court concluded that the FCC had indeed exceeded its statutory authority in issuing the preemption order at issue.

Act] need not be a collateral attack on a declaratory ruling [of the FCC] for 28 U.S.C. § 2342 to vest exclusive jurisdiction in the court of appeals. All that is required is that the complaint filed in the district court raise the same issues and seek the same relief in substance as the declaratory ruling.")  Despite Plaintiff's protestations that it is not seeking to invalidate the EBR exemption, this court cannot see how declining to apply the EBR exemption on the ground that the FCC exceeded its rulemaking authority differs from a declaration that the exemption is invalid.  This court may consider whether the EBR exemption applies to the particular facts of this case, but it lacks the jurisdiction to consider its validity as a rule.

**The EBR Exemption Applies to Faxes Sent to Businesses**

Having determined that the court must accept the EBR exemption as a valid final order, the court at last turns to the question of its applicability to the parties in this case.  Plaintiff argues that the FCC intended the rule to apply only to faxes sent to residences, not to businesses, and asserts that the court may ignore the EBR exemption because Plaintiff is a business subscriber under the TCPA.  In support, Plaintiff cites the following definition of an "established business relationship" from the 1992 Report and Order:

> The term "established business relationship" means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a *residential subscriber* with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the *residential subscriber* regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

1992 Report and Order, app.  B, 7 FCC Rcd at 8793 (emphasis added).  Because this definition refers only to residential subscribers, Plaintiff contends that the defense did not apply to business subscribers until the JFPA took effect in 2005.  (Pl. Resp. at 19-20.)  In the 1992 Report and Order, the term "residential subscriber" is not defined, and "business subscriber" does not appear at all. Plaintiff contends that the language of the JFPA confirms the distinction: the JFPA amended the FCC's original language by adding a provision describing an EBR as "a relationship between a

person or entity and *a business subscriber*", 47 U.S.C. § 227(a)(2)(A) (emphasis added), and subsequently, the FCC incorporated this language as part of its rules in defining an EBR for the purposes of sending unsolicited fax advertisements:

> For purposes of paragraph (a)(3) of this section, the term established business relationship means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a business or residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the business or residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

47 C.F.R. §§ 64.1200(f)(5).

Defendant counters that the section cited by Plaintiff applies only to a specific provision of the 1992 Report and Order dealing with "using an artificial or prerecorded voice" in calls placed to residential telephone lines. (Def. Reply at 6-7.) The language quoted by Plaintiff appears in Appendix B of the 1992 Report and Order in which the FCC published the implementing regulations for inclusion in the Code of Federal Regulation. 1992 Report and Order, app. B, 7 FCC Rcd at 8790. This definition of an EBR is necessarily limited to residential subscribers, Defendant notes; it appears in the section addressing the prohibition on calls to residences and is thus logically "a defense to a claim that can be brought only by residential subscribers." (Def. Reply at 6-7.) Indeed, Plaintiff's definition of EBR is preceded by the limiting words "[a]s used in this section" and appears under the heading "Subpart L–Restrictions on Telephone Solicitation." *Id.* at 8790, 8792.

The only mention of an exemption for fax advertisements in the 1992 Report and Order appears in a footnote and states that "facsimile transmission from persons or entities who have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient." 71 F.C.C.R. at 8784. The footnote does not further characterize the "recipient" as either a residential or a business subscriber. The court notes that for the most part, the 1992 Report and Order deals with issues involving unsolicited telephone calls to residences. The

Report's "Background" section explains that the FCC has chosen to "exempt from the prohibition on prerecorded or artificial voice message calls to residences those calls . . . [that are] made to a party with whom the caller has an established business relationship," but does not mention fax machines. *Id.* at 8755. In fact nearly all of the language outlining the definition and scope of an EBR appears in a section of the Report labeled "Exemptions to Prohibited Uses of Artificial or Prerecorded Messages," a section that focuses primarily on "prerecorded message calls to residences." *Id.* at 8770. Nonetheless, in the midst of this discussion, the FCC states a preference for defining the term "business relationship" broadly and, in keeping with this preference, defines "established business relationship" as "a prior or existing relationship formed by a voluntary two-way communication between the caller and the called party, which relationship has not been previously terminated by either party." *Id.* at 8771. Although this is not the definition that appears in the C.F.R., it does suggest that the FCC did not intend to restrict "business relationships" only to residential subscribers under the rules. The Report goes on to explain, "A broad definition of the business relationship can encompass a wide variety of business relationships (e.g., publishers with subscribers, credit agreements) without eliminating legitimate relationships not specifically mentioned in the record." *Id.*

Defendant's broad interpretation of the scope of the EBR exemption finds additional support in later FCC statements. Like the 1992 Report and Order, the 1995 Report and Order eschews any kind of residential limitation in its discussion of fax solicitations. *See* 10 F.C.C.R. at 12408 ("The [1992] Report and Order makes clear that the existence of an established business relationship establishes consent to receive telephone facsimile advertisement transmissions.") In 2001, the FCC issued a Public Notice titled *FCC Reminds Consumers About "Junk Fax" Prohibition* in which it stated, "The prohibition [on unsolicited advertisements] applies to unsolicited advertisements transmitted *to both businesses and residences* . . . . An established business relationship, however, demonstrates consent to receive fax advertisement transmissions." 16 F.C.C.R. 4524 (Feb. 20,

2001) (emphasis added).  The 2003 Report and Order similarly recognized that the EBR exemption had until that time been "sufficient to show that an individual *or business* has given their express permission to receive unsolicited facsimile advertisements."  18 F.C.C.R. at 14127 (emphasis added).  While the FCC has not always specified precisely to whom the EBR exemption should apply, it has expressed a clear preference for reading the definition of an EBR broadly, and the court defers to this preference.  See 1992 Report and Order, 7 F.C.C.R. at 8770-71.  Finally, the court finds Defendant's contention that "the FCC's interpretation is consistent with common sense" persuasive: "Why would the FCC afford greater protection from unwanted faxes to business subscribers than to residential subscribers?"  (Def. Reply at 8.)

**The EBR Exemption Applies to the Relationship Between the Parties**

Under the current FCC rules, the burden rests "on the sender to show that it has a valid EBR with the recipient."  Rules and Regulations, 71 Fed. Reg. 25,967 (May 3, 2006).  In its Motion for Summary Judgment, Defendant has produced extensive, unrebutted documentation of its relationship with Plaintiff: Plaintiff was a subscriber to three of Defendant's publications as of August 23, 2004, the date Defendant sent the unsolicited fax, and had repeatedly renewed its subscriptions over the years.  Nor has Plaintiff presented evidence that it at any time sought to unsubscribe from Defendant's publications or to terminate its relationship with Defendant.  Further, Plaintiff concedes that it "is a business subscriber as the fax number is owned and maintained by the business."  (Pl. Resp. at 21.)  In short, Defendant has successfully asserted its existing business relationship with Plaintiff as a complete defense to liability under the TCPA.  The court therefore enters summary judgment in its favor.

<u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion for summary judgment [67] is granted.

ENTER:

<u>23</u>

Dated: August 12, 2009

_____
REBECCA R. PALLMEYER
United States District Judge